IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALICIA JARDINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV12 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Alicia Jardine ("Plaintiff"), proceeding *pro se*, brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

## I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on April 16, 2015, alleging a disability onset date of April 1, 2015. (Tr. at 109.)[2] Her claim was denied initially (Tr. at 161-71, 194-

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Record [Doc. #11].

97), and that determination was upheld on reconsideration (Tr. at 172-93, 200-07). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 209-10.) Plaintiff attended the subsequent hearing on May 10, 2017, along with her attorney and an impartial vocational expert. (Tr. at 109.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 127), and, on November 9, 2018, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 2-7).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

2

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy.

Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date, April 1, 2015. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 111-12.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> Diabetes mellitus, obesity, degenerative disc disease, osteoarthritis, obstructive sleep apnea, and history of excision of urethral sling mesh[.]

(Tr. at 112.) The ALJ next found at step three that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing. (Tr. at 116-17.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, through her date last insured, Plaintiff had the RFC to perform light work with additional limitations to occasional stooping and frequent climbing, kneeling, crouching, and crawling. (Tr. at 117.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that

5

Plaintiff remained "capable of performing past relevant work as a Financial Customer Service Representative, Manager of a Financial Institution, and Credit Clerk/Loan Clerk." (Tr. at 125.) The ALJ also made an alternative, step five finding that, given Plaintiff's age, education, work experience, and RFC, she could perform other jobs available in the national economy, including positions that would accommodate a sit/stand option. (Tr. at 125-26.) In light of the findings at steps four and five, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 127.)

Plaintiff, proceeding *pro se*, now challenges the ALJ's decision in several respects set out in her Complaint, her Motion, and her supporting Brief. First, in her Complaint, she argues that the ALJ erred by relying on a functional evaluation from June 2015 and "has not included substantial evidence in [her] case since." (Compl. [Doc. #2] at 3.) However, Plaintiff filed her Application on April 16, 2015, alleging a disability onset date of April 1, 2015. Therefore, the functional capacity evaluation dated June 17, 2015 is clearly relevant. (Tr. at 582-89.) In addition, the ALJ's opinion reflects a thorough review of the medical evidence from that time through the date of the decision in 2017. In her Complaint, Plaintiff also alleges that the Commissioner erred by sending her "to the state psychologist rather than a medical doctor for review of [the] physical issues in which [she is] filing the claim for." (Compl. at 3.) However, the record included the June 2015 physical evaluation, and Plaintiff was sent to a consultative psychological exam not for her physical issues but to address her claimed mental impairments. (Tr. at 854-57.) The ALJ considered both her physical impairments and alleged mental impairments, and Plaintiff's allegations in the Complaint to do not establish any error

6

by the ALJ. Plaintiff raises various other contentions in her Motion and Brief, each of which the Court considers in turn.

1. Determination of Severe Impairments at Step Two

In her Motion, Plaintiff contends that the ALJ failed to include all of her diagnosed conditions on the list of severe impairments. At step two of the evaluation process, a plaintiff must establish a "severe impairment," that is, an "impairment or combination of impairments that significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). However, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted); see also Blevins v. Colvin, No. 5:15-cv-14240, 2016 WL 6987169, at *9 (S.D.W. Va. Sept. 16, 2016) (collecting cases). Therefore, in considering the alleged error at step two in this case, the Court also considers the ALJ's explanation and discussion throughout the sequential analysis.

In this case, at step two, the ALJ identified Plaintiff's diabetes mellitus, obesity, degenerative disc disease, osteoarthritis, obstructive sleep apnea, and history of excision of urethral sling mesh as severe impairments. (Tr. at 112.) Notably, as part of the degenerative disc disease impairment, the ALJ considered all of Plaintiff's spine-related impairments. Similarly, as part of the "history of excision of urethral sling mesh" impairment, the ALJ considered Plaintiff's pelvic-related and nerve-related impairments, and as part of the

7

"osteoarthritis" impairment, the ALJ considered Plaintiff's knee-related impairments. Therefore, any failure to list each specific diagnosis is harmless. With respect to Plaintiff's peripheral neuropathy, the ALJ found that impairment non-severe. Plaintiff alleges that this was in error, citing to a record from her neurologist (Tr. at 1132-33). However, that record reflects simply:

> Patient with complaints of sensory symptoms of burning all over, with sensory peripheral neuropathy clinically but negative NCV/EMG. An EMG nerve conduction study was reviewed. She is on gabapentin for her pain syndrome. Likely due to hyperglycemia. Strongly recommend weight reduction and low carb diabetic diet.

(Tr. at 1133.) This record is not inconsistent with the ALJ's analysis at step two, which cited to a normal Electromyography (EMG) and nerve conduction velocity (NCV) in 2015. (Tr. at 112.) Moreover, the medical record cited by Plaintiff is consistent with the rest of the evidence from Plaintiff's neurologist, which was specifically considered and discussed by the ALJ in reviewing the evidence and formulating the RFC. (Tr. at 119-21, 124.) Thus, any error in failing to include peripheral neuropathy at step two is harmless, since all of the evidence was considered at later steps.

Finally, with respect to Plaintiff's affective disorder (depression) and anxiety disorder, the ALJ discussed the evidence at length at step two and expressly determined that Plaintiff's "medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas" and was therefore non-severe. (Tr. at 115.) In making that determination, the ALJ included an extensive analysis of Plaintiff's mental impairment and its effect on her

Case 1:19-cv-00012-WO-JEP   Document 20   Filed 09/01/20   Page 8 of 33

ability to work, both at step two and in considering the opinion evidence. (Tr. at 115, 124.)

As part of that analysis, the ALJ considered each of the four functional areas:

> The first functional area is understanding, remembering, or applying information. In this area, [Plaintiff] has a mild limitation. . . . The record indicates the claimant has minimal problem with short-term and long-term memory function. She has the ability to follow through with medical advice and prescribed treatment. She has insight into her impairment and prognosis. The record indicates that the claimant attended school and earned a real-estate license after the alleged onset date of disability. On May 2016, the claimant was well groomed. She related well with the interviewer and was friendly and pleasant. Her speech was intelligible, coherent, and of normal rate and volume. Her thinking was logical evidenced by her goal-directed speech. She was able to hold 3 out of 3 objects in immediate and short-term memory storage across 5 minutes. She was oriented x4. She was able to do serial threes, but not serial sevens. She denied having hallucinations or delusions. She also denied having suicidal or homicidal ideation or behavior (Exhibit 35F/13).

> The next functional area is interacting with others. In this area, the claimant has a mild limitation. . . . In a Function Report, the claimant indicated that she has no problems getting along with family, friends, or neighbors. The claimant noted that she goes out less, socializes less and spends less time with her children and more time in bed (Exhibit 5E/6). The claimant reported that she gets along very well with authority figures and she has never been fired or laid off from a job because of problems getting along with others (Exhibit 5E/7). In a consultative examination, the claimant indicated that she has regular contact with family members and friends, and she attends church on occasion (Exhibit 23F/3).

> Treatment notes indicate that the claimant has had normal affect on multiple examinations (*see e.g.*, Exhibits 19F/5, 19F/10, 19F/15, 33F/3, 33F/7, 33F/9, 33F/11, 33F/13, 34F/8, 34F/16, 34F/24, 34F/30, 36F/10, 39F/13, 40F/5, 41F/8, 41F/21, 44F/37, 44F/68, 44F/92, 44F/112, 47F/2, 47F/5, 47F/8, 47F/11, 47F/13, 47F/16, 47F/20, 49F/20, and 49F/33). As noted above, the [record also] indicates that the claimant attended school and earned a real-estate license after the alleged onset date of disability.

> The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. . . . In a consultative examination, the claimant indicated that she has trouble concentrating; however, the claimant also noted that she reads books and enjoys suspense novels and biographies (Exhibit 23F/3). In addition, medical records indicate that short-term memory, attention, judgment, and concentration have been intact on examination

9

(Exhibits 32F/9, 32F/15, 32F/25, and 37F/13). On mental status examination in August 2016, the claimant was alert and oriented. She had good eye contact. She was polite and pleasant. Mood was "good" and affect was congruent. Attention and concentration were good. Judgment and insight were good (Exhibit 35F/5). In Exhibit 47F, Review of Systems (in the treatment notes from Grace Medical Group) state, "She denies anxiety, depression, insomnia, or concentration difficulty" (Exhibits 47F/2, 47F/4, 47F/15, and 47F/19). The record indicates that the claimant attended school and earned a real-estate license after the alleged onset date of disability.

The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation. . . . In a Function Report, the claimant indicated that she handles stress very well (Exhibit 5E/7). In August 2016, the claimant presented to Carolinas Psychiatry for medication management. Therein, the claimant reported significant improvement in symptoms of anxiety. The claimant noted that school is going really well. She denied suicidal ideation, homicidal ideation, and thoughts about death/dying (Exhibit 35F/3). Treatment notes indicate that the claimant helps with her three grandchildren as well as her own three kids, and the middle child has special needs (Exhibit 35F/4). The mental status examination was unremarkable (Exhibit 25F/5).

(Tr. at 113-15; see also Tr. at 124 (noting that Plaintiff "was able to earn a real estate license in 2016 and attended classes in finance in 2017. The record indicates that [Plaintiff] is capable of sustaining focused attention and concentration sufficiently long enough to permit the timely and appropriate[] completion of tasks commonly found in work settings.")) Plaintiff contends that the ALJ erred in this analysis, particularly by relying on her ability to obtain a real estate license and attend classes, but these are fair considerations in determining the extent to which Plaintiff's mental impairment might have affected her ability to work at that time. Plaintiff has failed to show any error in the ALJ's analysis or that the analysis is not supported by substantial evidence.

2. Listing Determination at Step Three

Plaintiff develops her argument further in her brief, arguing that her impairments meet Listings 1.02, 1.04, 3.02, 5.00, 11.08, 11.14, 12.04, 12.06, and 12.08, many of which were not

10

expressly considered by the ALJ. At step three of the sequential analysis, an ALJ must determine whether a claimant's impairments meet or equal the medical criteria of 20 C.F.R., Pt. 404, Subpt. P, App. 1, which sets forth a list of impairments that warrant a finding of disability without considering vocational criteria. 20 C.F.R. § 404.1520(d); see also Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) ("A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition meets or equals the listed impairments." (internal quotations and citations omitted)). Notably, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Moreover, the claimant has the burden of presenting evidence to establish that all of the criteria are met. See Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986).

Here, the ALJ expressly considered whether Plaintiff's severe impairments met the listing requirements for musculoskeletal impairments or endocrine impairment.[5] In terms of Plaintiff's back impairment, the ALJ set out the requirements of Listing 1.04, which consists of an introductory paragraph outlining two requirements: (1) a disorder of the spine (2) resulting in compromise of a nerve root or the spinal cord. If a claimant meets both of these requirements, she must then show that she meets one of the three additional sets of criteria set out in part A, part B, or part C of the listing. Part A requires evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the

---

[5] The ALJ determined that Plaintiff's diabetes mellitus was not a listing-level endocrine impairment (Tr. at 116), and Plaintiff does not challenge that finding here.

Case 1:19-cv-00012-WO-JEP   Document 20   Filed 09/01/20   Page 11 of 33

spine, motor loss (i.e., weakness) accompanied by sensory or reflex loss, and, if the lower back is involved, a positive straight-leg raising test. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04A. Alternatively, part B requires medically-confirmed evidence of spinal arachnoiditis; part C requires evidence of "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04C. In the present case, Plaintiff does not specify which part of Listing 1.04 she claims to meet. However, as related by the ALJ at step three, Plaintiff's December 2014 lumbar spine MRI "showed L5-S1 degenerative disc disease with no nerve root compression, no stenosis, and no disc herniation," as required to meet Listing 1.04A or C (Tr. at 116, 463), and the record contains no evidence of spinal arachnoiditis as required to meet Listing 1.04B. Moreover, Plaintiff suggests no additional evidence would support such a different conclusion, and none is apparent from a thorough review of the record. Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff's degenerative disc disease failed to meet the requirements of Listing 1.04.

The ALJ provided a similar analysis of Plaintiff's osteoarthritis under Listing 1.02, specifically finding that Plaintiff

> does not have a major dysfunction of a joint(s) characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) WITH (A) Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b OR (B) Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

12

(Tr. at 116.) Section 1.00B2b(1) defines the inability to ambulate effectively as

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes
> very seriously with the individual's ability to independently initiate, sustain, or
> complete activities.   Ineffective ambulation is defined generally as having
> insufficient lower extremity functioning . . . to permit independent ambulation
> without the use of a hand-held assistive device(s) that limits the functioning of
> both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00B2b(1).  Section 1.00B2b(2) then goes on to provide

"examples of ineffective ambulation," which

> include, but are not limited to, the inability to walk without the use of a walker,
> two crutches or two canes, the inability to walk a block at a reasonable pace on
> rough or uneven surfaces, the inability to use standard public transportation;
> the inability to carry out routine ambulatory activities, such as shopping and
> banking, and the inability to climb a few steps at a reasonable pace with the use
> of a single hand rail.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00B2b(2).

Here, the ALJ specifically found that "[t]he record does not establish that a hand-held

assistive device is medically required."  (Tr. at 124.)   Moreover, although it is occasionally

noted by Plaintiff's providers that she utilizes a cane at her appointments, there is no evidence

that the cane was medically necessary, let alone that Plaintiff was unable to walk "without the

use of a walker, two crutches[,] or two canes" such that "functioning of both upper

extremities" is limited. [6]  Therefore, the ALJ concluded that Plaintiff's osteoarthritis did not

meet Listing 1.02.

---

[6] In addition, nothing in the record suggests that both of Plaintiff's upper extremities were so affected by
arthritis that she was unable to perform fine and gross movements effectively, as required to meet Listing 1.02B
("Inability to perform fine and gross movements effectively means an extreme loss of function of both upper
extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently
initiate, sustain, or complete activities.).

13

The remaining listings identified by Plaintiff, consisting of Listings 3.02, 5.00, 11.08, 11.14, 12.04, 12.06, and 12.08, were not expressly considered by the ALJ. However, as previously set out in the Middle District,

> [t]he duty to identify relevant listed impairments is triggered when there is "'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments. . . ." Ketcher v. Apfel, 68 F.Supp.2d 629, 645 (D. Md. 1999) (quoting Cook, 783 F.2d at 1172-73; see, e.g., Martin v. Colvin, No. 1:11CV408, 2014 WL 4114207, at *4 (M.D.N.C. Aug. 20, 2014); Drane v. Colvin, No. 1:10CV901, 2014 WL 408753, at *4 (M.D.N.C. Feb. 3, 2014); see also Morgan v. Colvin, No. 7:13-CV-279-BO, 2014 WL 6473525, at *2 (E.D.N.C. Nov. 18, 2014) ("The ALJ's failure to consider [the] Listing . . . in this instance, where there is obviously evidence that may support the listing, is clear error."). "Neither the Social Security law nor logic commands an ALJ to discuss all or any of the listed impairments without some significant indication in the record that the claimant suffers from that impairment." Ketcher, 68 F. Supp. 2d at 645.

McCauley v. Colvin, No. 1:13CV534, 2016 WL 3566659, at *6 (M.D.N.C. June 24, 2016). In McCauley, the court found that (1) the plaintiff's "brief fail[ed] to point to any medical findings demonstrating that his impairments equal or meet all the criteria of Listing 1.02A," and (2) the record lacked "evidence sufficient enough to trigger the ALJ's duty to discuss [that] Listing." Id. at *7 (citing Clansy v. Comm'r of Soc. Sec., No. SAG-15-0106, 2015 WL 6152253, at *2 (D. Md. Oct. 16, 2015) (unpublished) (finding several requirements of a Listing "not present on the record . . . thus no ample evidence exists to mandate an express discussion of the Listing")). Accordingly, the plaintiff's step three challenge failed.

Similarly, in the present case, the record is devoid of evidence sufficient to trigger discussions of the additional listings set out by Plaintiff. Plaintiff argues, for instance, that her mental impairments meet the requirements of Listings 12.04 (depression/affective disorder), 12.06 (anxiety disorder), and 12.08 (personality/impulse control disorder), despite the ALJ's

14

finding that Plaintiff's affective disorder and anxiety were non-severe impairments, and that her alleged personality disorder failed to merit inclusion at step two. The ALJ's lengthy analysis at this step amply supports her treatment of these impairments. In addition to meeting the medically-documented findings of symptoms set out in part A of each of the listings in question, a claimant must also show that she meets the requirements set out in part B, which are identical for Listings 12.04, 12.06, and 12.08. To meet part B of these listings, a claimant must have an extreme limitation of one or marked limitation of two of the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04B, 12.06B, and 12.08B. Here, however, the ALJ specifically found that Plaintiff had no more than a mild limitation in each of these areas. Moreover, the ALJ included explanations for her findings with substantial support from the record, including medical evidence, the opinions of the consultative psychologist and State agency psychological consultants, and Plaintiff's ability to attend school and work during the alleged disability period. Accordingly, in light of this analysis at step two and the dearth of evidence supportive of any mental disorder listings, the ALJ was not required to undertake a further analysis of these listings at step three of the sequential analysis.[7]

---

[7] Although Listings 12.04 and 12.06 can be met, in the alterative, by meeting both part A and part C, part C of these listings requires a showing of restrictions even more extreme than those set out in part B. As to both Listing 12.04 and 12.06, part C requires a mental disorder with marginal adjustment, leaving the individual "unable to function outside of [her] home or a more restrictive setting," or with "episodes of deterioration that have required [her] to be hospitalized." 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.06C, § 12.04C, § 12.00G2c. Again, Plaintiff makes no argument that she meets any of these criteria, and no record evidence appears to support such a finding.

The two neurological listings alleged by Plaintiff, Listing 11.08 (spinal cord disorders) and Listing 11.14 (peripheral neuropathy), encounter similar issues. Listing 11.08 requires that Plaintiff meet part A, part B, or part C, while Listing 11.14 includes similar provisions. As Defendant correctly notes, there is no evidence that Plaintiff has spinal cord disorders that have caused a "complete loss of function," meaning a "complete lack of motor, sensory, and autonomic function," as required by Listing 11.08A. (Def.'s Br. at 13) (citing 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00M2). Plaintiff also clearly fails to meet Listing 11.08C, or the similar requirements of Listing 11.14B, which require evidence of marked limitation in physical functioning <u>and</u> in one of the four areas of mental functioning previously discussed with reference to Listings 12.04, 12.06, and 12.08. As set out above, the ALJ found that Plaintiff was no more than mildly limited in (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing herself.

Similarly, Listing 11.08B and Listing 11.14A each require a showing of extreme limitations beyond those documented in the record. Specifically, these Listings require

> [d]isorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.08B; § 11.14A. In this context, "extreme limitation" of motor function "depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders)," and is defined as follows:

    a.  Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of

another person or the use of an assistive device, such as a walker, two crutches, or two canes.

b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes.

c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.00D2. As previously discussed, Plaintiff has not

shown a need for assistive devices sufficient to meet part (b) of this definition (§ 11.00D2(b)),

nor has she shown any significant limitation in use of her upper extremities such that part (c)

would apply (§ 11.00D2(c)). Although Plaintiff does allege that she has difficulty standing

from a seated position, she has not alleged that "once seated [she is] unable to stand and

maintain an upright position without the assistance of another person or the use of an assistive

device, such as a walker, two crutches, or two canes" as required by part (a) (§ 11.00D2(a)).

In short, the record lacks any evidence, let alone "ample evidence," to trigger analysis of

Listings 11.08 or 11.14.

Turning to Listing 5.00 (digestive system disorders), Plaintiff's claim again finds little

to no support. As Defendant correctly notes, "Plaintiff merely cites the introductory portion

of the listing and claims that she meets the threshold of having been diagnosed with a

qualifying condition, liver dysfunction." (Def.'s Br. at 13) (citing Pl.'s Br. at 9). Although

17

Plaintiff asserts that "the diagnosis of hepatic steatosis falls under the category mentioned above" and that "[s]upporting documentation can be found within Exhibit 2F/5" (Pl.'s Br. at 9); (see Tr. at 415-16), "Plaintiff does not specify which, if any, sections within the 5.00 category she claims to meet." (Def.'s Br. at 13.) Moreover, it appears that Plaintiff's "mild hepatic steatosis" was an incidental finding of her abdominal MRI (Tr. at 415), and Plaintiff fails to allege any treatment for, or symptoms of, this condition, let alone symptoms severe enough to meet—or even trigger the consideration of—a listing. See 20 C.F.R. § 404.1525(d) (stating that diagnosis alone is insufficient to meet a listing).

Finally, with respect to Plaintiff's claim under Listing 3.02 (respiratory disorders), nothing in the record indicates that Plaintiff's asthma or obstructive sleep apnea meet all of the requirements of this listing, as she alleges. Although Plaintiff cites Exhibits 1F and 37F, p. 7 as "supporting documentation" for her contention, these records merely reflect her asthma and sleep apnea diagnoses, which, as noted above, are insufficient, by themselves, to meet a listing. (See Tr. at 404-10, 1127.) The evidence cited by Plaintiff, and the record as a whole, further support the ALJ's finding that these conditions were well-controlled with prescribed treatment and would not come close to the level of severity contemplated by Listing 3.02. In particular, the Tables associated with this listing provide that a claimant of Plaintiff's gender, age, and height requires a Forced Expiratory Volume (FEV) value of 1.45 or less or a Forced Vital Capacity (FVC) measurement of 1.70 or less to meet the listing. See 20 C.F.R. pt. 404, subpt. P, App. 1, § 3.02, Tables I and II. Plaintiff, in contrast, had FEV measurements of 2.34 and 2.41 and an FVC of 2.80. (Tr. at 404-05.) Accordingly, Plaintiff's asthma clearly

18

fails to meet all of the requirements of Listing 3.02, and, given Plaintiff's test results, the ALJ did not err in omitting a discussion of this Listing at step three.

Overall, the Court simply cannot conclude that there is "'ample evidence in the record to support a determination' that [Plaintiff's] impairment me[t] or equal[ed] one of the listed impairments" during the time period at issue here. Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999) (quoting Cook v. Heckler, 783 F.2d 1168, 1172-73 (4th Cir. 1986)). Nor is there a "fair amount of evidence supportive of [her] claim." Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Thus, the record before the ALJ did not include evidence that would have triggered further analysis of the Listings, and any failure is harmless in any event given the clear lack of evidence to support Plaintiff's contentions.

3. Symptom Evaluation

In her Motion, Plaintiff also contends that the ALJ failed to properly evaluate her allegations of pain. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, 82 Fed. Reg. 49462, 49467 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 416.929. In Craig v. Chater, the Fourth Circuit addressed the two-part test for evaluating a claimant's statements about symptoms. Craig, 76 F.3d at 594-95. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be

19

expected to produce the pain or other symptoms alleged.'" Id. at 594 (emphasis omitted) (citing 20 C.F.R. § 416.929(b)). If the ALJ determines that such an impairment exists, the second part of the test then requires him to consider all available evidence, including Plaintiff's statements about his pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 595.

This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3):

(i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;

(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;

(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20

Where the ALJ has considered these factors and has heard Plaintiff's testimony and observed Plaintiff's demeanor, her determination is entitled to deference. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

In the present case, the ALJ determined that Plaintiff has "medically determinable impairments that could reasonably cause pain but not to the extent alleged." (Tr. at 122.) Therefore, Plaintiff's challenge hinges on step two of the Craig analysis. It is undisputed that at step two of the analysis, the ALJ should not reject a claimant's statements "about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . . solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 416.929(c)(2). Thus, "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." Lewis v. Berryhill, 858 F.3d 858, 866 (4th Cir. 2017). However, it is also undisputed that a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities [only] to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4). Thus, objective medical evidence and other evidence in the record are "crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work" and "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be

expected to cause the pain the claimant alleges she suffers." Hines, 453 F.3d at 565 n.3 (4th Cir. 2006) (quoting Craig, 76 F.3d at 595); see also SSR 16-3p ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities . . . ."). According to the regulatory guidance:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, 2017 WL 5180304, at *8.

In the present case, a thorough review of the ALJ's decision and the record as a whole reveals that the ALJ properly considered objective medical evidence and other evidence, and explained that determination in the decision. In evaluating the evidence, the ALJ specifically identified multiple reasons supporting her determination. For example, the ALJ found that "medical records reveal that the medications have been relatively effective in controlling [Plaintiff's] symptoms"; that "[i]t has been recommended that [Plaintiff] work 'as much as possible to keep body moving and joints moving'"; and that Plaintiff "indicated that she enjoys working out and going to the pool with her best friend." (Tr. at 123.) In addition, the ALJ found that her activities of daily living were "not as limited as one would expect given her complaints," in particular that the record reflected she was "able to care for her disabled daughter"; that she "has participated in the sale/rental of real estate"; that she "has taken

22

classes at a community college"; and that she has "applied for jobs." (Tr. at 123.) The ALJ also weighed the opinion evidence, including the third party statements. While Plaintiff disagrees with the ALJ's evaluation and asks the Court to reconsider the decision and re-weigh the evidence, this Court does not re-weigh the evidence or consider the matter de novo; instead, the Court only considers whether there is substantial evidence to support the ALJ's determination. Here, the ALJ's decision as it relates to evaluation of Plaintiff's symptoms is susceptible to judicial review and supported by substantial evidence. Plaintiff has not identified any errors that require remand.

4. Additional Evidence

Finally, Plaintiff raises several contentions regarding the completeness of the evidence. Plaintiff first contends that evidence existed that her representative either did not submit to the ALJ or submitted late, and thus was not considered. Plaintiff subsequently submitted extensive additional evidence to the Appeals Council, and has now also submitted additional evidence in her filings in this case. The Court considers each of these submissions in turn.

First, with respect to evidence submitted to the ALJ, the Court notes that the ALJ's opinion reflects that one set of records, designated as Exhibit 49F, was submitted well after the hearing without good cause to support the late filing, and therefore was not admitted as evidence into the record. (Tr. at 109.) In other words, the ALJ did not consider Exhibit 49F, comprised of Plaintiff's treatment for pudendal nerve pain at UNC – OBGYN Health Care between May 2015 and August 2016, when making her decision. (See Tr. at 1387-1421.) However, these records are duplicates of Exhibit 8F (Tr. at 501-08) and Exhibit 41F (Tr. at

23

1176-1210), which were considered by the ALJ. Thus, all of these records were already before the ALJ and were fully considered. As such, any late submission of Exhibit 49F was harmless.

Plaintiff also contends that her provider at Pain MD informed her than "she never received the request to fill out any paperwork for [Plaintiff]," as it had been sent to the wrong address. (Pl.'s Br. at 5.) Plaintiff further alleges that her counsel submitted no records from Grace Medical Clinic, her primary care provider. (Id.) Finally, Plaintiff asserts that her counsel failed to submit the medical journal that she'd been keeping over the years that shows that she "was already complaining about standing and walking in 2014 due to [her] back pain so coupled with the pelvic nerve pain, sitting is also a major issue." (Id. at 6.) Upon review of the records, however, it appears that Plaintiff simply overlooked much of the evidence she now claims was omitted. Plaintiff's treatment records from Grace Medical Clinic, where she was noted to be a new patient on March 28, 2016, continuing through April 10, 2017 (the month prior to hearing with the ALJ), are marked as Exhibits 28F, 33F, and 47F of the administrative record, and were discussed by the ALJ at length in her decision. (Tr. at 119-22.) Plaintiff's treatment records from her previous primary care providers at Asheboro Family Physicians (Ex. 10F, 22F, and 31F) are also included, as are her records from Pain MD (Ex. 27F, 32F, 34F, and 44F) and other pain management providers (Ex. 5F, 14F, 18F, 24F, 29F, and 40F). The contents and impact of these records were considered by the ALJ, along with the record as a whole, consisting of more than a thousand pages of medical evidence, including consultative examinations, a physical work performance evaluation, radiology reports, and opinion evidence. (Tr. at 118-24.)

24

Plaintiff submitted additional evidence to the Appeals Council, with a pro se appeal letter raising many of these same issues. (Tr. at 386-403.) The evidence included Plaintiff's journal, additional records from Pain MD, radiology results, school transcripts and disability accommodations, various doctors' notes, and an opinion letter from Erika Kam, FNP-BC, a provider at Grace Medical Clinic. (See Tr. at 1-105.) However, the Appeals Council found that (1) Ms. Kam's letter did not relate to the time period at issue, (2) several pages were duplicative of medical evidence already included in the record, and (3) that the remaining evidence did "not show a reasonable probability that it would change the outcome of the [ALJ's] decision." (Tr. at 3.) Accordingly, the Appeals Council did not consider this evidence as part of the record in denying Plaintiff's request for review, and Plaintiff provides no basis for the Court to find that the Appeals Council erred in making its determination.

Finally, the Court notes that Plaintiff has now submitted additional evidence to this Court that was not previously submitted during the administrative process. This evidence includes records submitted as attachments to her Brief [Doc. #14-2], consisting of Plaintiff's mental health treatment record from DayMark, two letters from providers at Atrium Health, and disability insurance forms from CUNA Mutual Group completed by one of Plaintiff's primary care providers at Grace Medical Clinic. However, the additional evidence submitted with Plaintiff's present motion provides no basis for remand. The majority of the evidence consists of Plaintiff's treatment records from Daymark Recovery Services, Inc., where Plaintiff received therapy for anxiety and depression, specifically an assessment in March 2016 and records of six group therapy sessions during April – June 2016. During the same period, Plaintiff received psychiatric care through Carolinas Psychiatry (Tr. at 1093-1107), underwent

a comprehensive clinical psychological evaluation as part of her disability assessment (Tr. at 853-57), and received psychiatric care and medication management through her primary care provider, as set out and discussed in three full pages of the ALJ's decision (Tr. at 113-15). The ALJ included anxiety and affective disorder among Plaintiff's non-severe impairments in light of her treatment history (Tr. at 112), but further explained that Plaintiff's generally mild and well-managed symptoms failed to warrant any work limitations. Although Plaintiff now argues that her Daymark records show the need for mental RFC limitations, she fails to suggest what limitations are needed or which of her records could support them, and no restrictions are apparent from the records themselves, which generally track the mental health evidence considered and discussed at the time of the administrative hearing.

Moreover, this Court may not consider new evidence that Plaintiff did not submit to the ALJ or the Appeals Council. See Smith v. Chater, 99 F.3d 635, 638 n.5 (4th Cir. 1996). Instead, the Court can remand the case under sentence six of 42 U.S.C. § 405(g) for the Commissioner to consider the new evidence, if Plaintiff can demonstrate that the evidence qualifies as both new and material, and that good cause exists for the failure to submit the evidence to the ALJ or the Appeals Council. See Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 n.3 (4th Cir. 1991). Section 405(g) provides as follows:

> [A federal district court] may at any time order additional evidence to be taken before the Commissioner [], but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner [] shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a

26

transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added). "Evidence is new within the meaning of [§ 405(g)] if it is not duplicative or cumulative" and "is material if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96; see also Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001) (holding that "when the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if . . . there was good cause why it was not previously presented to the ALJ (Sentence Six review)").

Here, Plaintiff's Daymark records are arguably cumulative, and Plaintiff fails to demonstrate any reasonable possibility that their inclusion could have affected the outcome of her claim. Even were this not the case, Plaintiff has not shown "good cause for failing to present the evidence earlier." As Defendant correctly notes, Plaintiff was clearly aware of her ability to submit evidence. (Def.'s Br. at 4-6.) In light of Plaintiff's failure to meet any of the requirements for the submission of late evidence, the Court finds no basis for remand for consideration of the Daymark records.

Plaintiff's submission to the Court also includes two provider notes from Atrium Health and a set of disability insurance forms from CUNA Mutual Group completed by Plaintiff's primary care provider Dr. Tokunboh at Grace Medical Clinic. Notably, both Atrium Health notes are dated July 2019, and neither references Plaintiff's condition during the relevant time period. (See Pl.'s Br. Att. [Doc. #14-2] at 2-3.) In fact, the second note, from Plaintiff's OB-GYN provider, states that Plaintiff only began treatment there in February 2018. (Id. at 3.) Thus, these forms are not relevant because they do not relate to the time

27

period prior to November 20, 2017, and Plaintiff fails to demonstrate any reasonable possibility that their inclusion could have affected the outcome of her claim. The disability forms, in contrast, are dated September 27, 2017, nearly two months before the ALJ's November 20, 2017 hearing decision. (See Doc. #14-2, pp. 36-41.) However, as was the case with Plaintiff's Daymark records, Plaintiff fails to show good cause for failing to present this documentation earlier.

> Sentence six of 42 U.S.C. § 405(g) allows a court to order that additional evidence be taken before the Commissioner of Social Security, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." [42 U.S.C. § 405(g).] See also Hammond v. Apfel, 5 Fed. Appx. 101 (4th Cir. 2001)(unpublished) (Sentence six remand denied where evidence is new and material but plaintiff did not show good cause for the failure to incorporate the evidence into the prior record.)

> The good cause prerequisite obligates a plaintiff to demonstrate a reasonable justification for the failure to acquire and present the evidence at the administrative level. Combs v. Astrue, No. 5:06cv00072, 2007 WL 1129398, at *6 (W.D. Va. Apr. 17, 2007) (citing Templeton v. Comm'r of Soc. Sec., 215 Fed. Appx. 458 (6th Cir. 2007)). Good cause must be shown for failure to incorporate new evidence into the record not only at the ALJ stage of review, but also at the Appeals Council level. Miller v. Astrue, No. 2:07CV00056, 2008 WL 3285757, at *22 (W.D. Va. Aug. 8, 2008).

> Here, the subsequent favorable decision was issued . . . ten months before the Appeals Council denied Jones's appeal in this case . . . . Thus, while the new evidence was generated after the ALJ's opinion in the underlying claim, it was available almost a year before the Appeals Council's decision.

> The Fourth Circuit has suggested a high bar for establishing "good cause" for a sentence six remand. Wooding v. Comm 'r of Soc. Sec., No. 4:10cv00006, 2010 WL 4261268, at *4 (W.D. Va. Oct. 29, 2010). See also Hammond, 5 Fed. Appx. at 103 (4th Cir. 2001) (unpublished)("Without any explanation as to why his workman's compensation would not cover treatment earlier, we find that [plaintiff] has failed to demonstrate 'good cause' to excuse his failure to submit [new evidence]."); Wooding, 2010 WL 4261268, at *6 ("Good cause does not exist based solely on Plaintiff's after-the-fact desire to contradict the Vocational Expert's opinion and the ALJ's subsequent findings."); Rogers v. Barnhart, 204

F. Supp. 2d 885, 892 (W.D.N.C. 2002)("Plaintiff's failure to present such evidence to the Appeals Council is not *good cause*. Ultimately, it is plaintiff who bears the initial burden of production of evidence and the ultimate burden of persuasion.").

Jones v. Colvin, 2014 WL 359672, at *10 (W.D. Va. Feb. 3, 2014). In her Brief, Plaintiff concedes that the CUNA forms are dated September 2017, prior to the ALJ's decision, but she contends that she had a disability advocate representing her at the time and was unaware she could submit additional information to the ALJ at that time. (Pl.'s Br. at 6.) However, even if this provided a basis for excusing her failure to submit the evidence to the ALJ after the hearing, that does not provide good cause for failing to submit the evidence on appeal to the Appeal Council. Plaintiff was specifically notified, by letter to her home address, that she had the right to appeal the ALJ's decision and submit evidence to the Appeals Council. (Tr. at 106-08.) She clearly understood this option, as she submitted letters and medical records to the Appeals Council for review. However, she did not include the form from Dr. Tokunboh. See also Jones, 2014 WL 359672 at *10 ("Jones provided no explanation as to why she failed to provide the subsequent favorable decision and underlying additional evidence to the Appeals Council. . . . Additionally, Jones submitted Dr. Albers's May 21, 2011 opinion to the Appeals Council in this case; thus she was aware of the opportunity to submit additional evidence, and capable of doing so in a timely manner."). Plaintiff has failed to show good cause for failing to submit the form from Dr. Tokunboh when the claim was before the Commissioner.[8]

_____

[8] The Court also notes that, as set out in the Commissioner's Brief, it is unlikely that Dr. Tokunboh's form opinion would have changed the ALJ's or the Appeals Council's determination. The form opinion appears inconsistent with Dr. Tokunboh's treatment notes and inconsistent with the substantial weight of the evidence prior to November 30, 2017, discussed at length in the ALJ's decision. In any event, even if the forms were

29

In a Supplement, Plaintiff also submits an October 28, 2019 decision of the North Carolina Department of Health and Human Services approving Plaintiff's claim for Medicaid as of January 2019 [Doc. #19]. However, this decision is clearly dated after the relevant period, and in substance relies primarily on medical records from 2018 and 2019 showing worsening of Plaintiff's conditions. Specifically, the decision finds that Plaintiff "has not worked since 2017" and "retains the ability to engage in sedentary work with a sit/stand option" but with a further limitation to "simple, routine tasks" and further limitations to standing less than six hours in a day and sitting for two hours in a day. (Id. at 1, 2, 8.) As a result of these further limitations, she was determined to be disabled.

To the extent Plaintiff is asking the Court to consider this new evidence, or to remand for consideration under § 405(g) Sentence Six, this evidence is not material to the time period from April 2015 to November 2017. See Baker v. Comm'r of Soc. Sec., No. 12–1709, 2013 WL 1866936, at *1 n. 1 (4th Cir. May 6, 2013) ("[A] subsequent favorable decision itself, as opposed to the evidence supporting the subsequent decision, does not constitute new and material evidence under § 405(g)."). To the extent that the Medicaid determination references Plaintiff's medical history prior to November 2017, it appears that all of the referenced records were included in the record before the ALJ and in the ALJ's discussion of the evidence. (Tr. at 113-24.) Plaintiff has not shown a reasonable possibility that this 2019 Medicaid determination would change the ALJ's determination for the time period prior to November 20, 2017, nor has Plaintiff shown a reasonable possibility that the evidence from 2018 and

---

considered new and material, Plaintiff has not shown good cause for failing to incorporate them into the record during the administrative process, as set out above.

30

2019 relied upon in reaching that Medicaid decision would change the ALJ's determination for the time period under consideration here. As noted above, the Medicaid decision finds that Plaintiff had "not worked since 2017," and the evidence recited in the decision reflects worsening since that time.

Similarly, the Court notes that much of Plaintiff's Motion and Brief argue that her condition has deteriorated, that the ALJ's decision is based on "old" evidence from 2015 and 2016, and that "a lot has changed as it is now 2019" and later evidence would show "significant changes since the new diagnoses." (Pl.'s Mot. [Doc. #13] at 11-12; Pl.'s Br. [Doc. #14] at 2.) However, the determination at issue in this case only relates to the time period up to November 20, 2017. If Plaintiff's condition has worsened since that time, or if she has been treated for new impairments not considered by the ALJ, she can file a new application for consideration and review of that evidence in a new administrative proceeding. See Horne v. Berryhill, 2017 WL 1155053, at *1 (M.D.N.C. Mar. 27, 2017) ("To the extent that the new evidence might relate to a time period after the date of the administrative determination, based on Plaintiff's contention that K.L.H.'s condition has 'gotten worse,' Plaintiff remains free to present the evidence in a new administrative application as to the later time period.").

Finally, the Court notes that in her Motion and Brief, Plaintiff also raises various criticisms of her representative and of the ALJ, and contends that she did not receive a full and fair hearing of her claim. The Fourth Circuit has held that:

> Claimants in disability cases are entitled to a full and fair hearing of their claims, 20 C.F.R. 404.927 and 416.1441, and the failure to have such a hearing may constitute good cause sufficient to remand to the Secretary under 42 U.S.C. § 405(g) for the taking of additional evidence. While lack of representation by counsel is not by itself an indication that a hearing was not full and fair, it is settled that where the absence of counsel created clear prejudice or unfairness

31

> to the claimant, a remand is proper. <u>Dombrowolsky v. Califano</u>, 606 F.2d 403
> (3rd Cir. 1979); <u>cf.</u> <u>Cross v. Finch</u>, 427 F.2d 406 (5th Cir. 1970).

<u>Sims v. Harris</u>, 631 F.2d 26, 27-28 (4th Cir. 1980) (footnote omitted). Here, Plaintiff has failed

to show that she did not receive a full and fair hearing of her claim. The record in her case

includes voluminous medical records, opinion letters, physical evaluations, consultative

examinations, and function reports. Plaintiff testified at the hearing and was clearly able to

articulate her contentions to the ALJ. Moreover, to the extent Plaintiff raises objections to

the weighing of the evidence by the ALJ, Plaintiff essentially asks the Court to re-weigh the

evidence and come to a different conclusion than the ALJ. However, it is not the function of

this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are

supported by substantial evidence. As noted above, "[w]here conflicting evidence allows

reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the ALJ." <u>Hancock</u>, 667 F.3d at 472 (quotation omitted). Thus, the issue

before the Court is not whether a different fact-finder could have drawn a different conclusion,

or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff]

is not disabled is supported by substantial evidence and was reached based upon a correct

application of the relevant law." <u>Craig</u>, 76 F.3d at 589. Here, the ALJ reviewed the evidence,

explained her decision, explained the reasons for her credibility determination, and supported

that explanation with substantial evidence.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding

no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversal or Modification

of Disability Decision and/or Remand for Rehearing" [Doc. #13] be DENIED, that

32

Defendant's Motion for Judgment on the Pleadings [Doc. #17] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 1st day of September, 2020.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge